<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 05-2180**

———————————

ATLANTIGAS CORPORATION,

Plaintiff - Appellant,

and

TRIAD ENERGY RESOURCES CORPORATION; ENERGY MARKETING SERVICES, INCORPORATED; AGF, INCORPORATED; ADVANTAGE ENERGY MARKETING, INCORPORATED; 1564 EAST LANCASTER AVENUE BUSINESS TRUST; NICOLE GAS MARKETING, INCORPORATED; STAND ENERGY CORPORATION, PLAINTIFF CLASS: Natural Gas Marketing Customers of Columbia Gas Transmission Corporation ("TCO") That Were Damaged By An Illegal Gas Scheme Perpetrated By Defendants,

Plaintiffs,

versus

COLUMBIA GAS TRANSMISSION CORPORATION; COLUMBIA GULF TRANSMISSION COMPANY; COLUMBIA LNG CORPORATION; CLNG CORPORATION; DOMINION COVE POINT LNG, LP; DOMINION COVE POINT LNG COMPANY, LLC, DEFENDANT CLASS A: Three Federally Regulated Interstate Natural Gas Pipeline Companies (Columbia Gas Transmission Company, Columbia Gas Gulf Transmission Company, And The Cove Point LNG Limited Partnership) That Participated in An Illegal Scheme, etc.; BASE PETROLEUM INCORPORATED; HOWARD ENERGY COMPANY, INCORPORATED; DYNEGY, INCORPORATED; SEMCO PIPELINE COMPANY; SEMCO ENERGY VENTURES, INCORPORATED; VIRGINIA ELECTRIC AND POWER COMPANY; EL PASO MERCHANT ENERGY, LP; COLUMBIA ENERGY SERVICES CORPORATION,

Defendants - Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Robert C. Chambers, District Judge. (CA-04-867-2; CA-04-868-2; CA-04-869-2; CA-04-870-2; CA-04-871-2; CA-04-872-2; CA-04-873-2; CA-04-874-2)

Argued:  September 19, 2006          Decided:  December 19, 2006

Before SHEDD and DUNCAN, Circuit Judges, and Richard L. VOORHEES, United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Barry Bach, HODES, ULMAN, PESSIN & KATZ, P.A., Towson, Maryland, for Appellant.  G. Hamilton Loeb, PAUL, HASTINGS, JANOFSKY & WALKER, L.L.P., Washington, D.C.; Roxane A. Polidora, Ryan Takemoto, PILLSBURY, WINTHROP, SHAW & PITTMAN, L.L.P., San Francisco, California, for Appellees.  **ON BRIEF:** Steven B. Schwartzman, Eric W. Gunderson, HODES, ULMAN, PESSIN & KATZ, P.A., Towson, Maryland, for Appellant.  Sabrina Rose Smith, Christopher T. Timura, PAUL, HASTINGS, JANOFSKY & WALKER, L.L.P., Washington, D.C., Thomas R. Goodwin, Johnny M. Knisely, II, GOODWIN & GOODWIN, L.L.P., Charleston, West Virginia, for Appellees Columbia Gas Transmission Corporation, Columbia Gulf Transmission Company, Columbia LNG Corporation, CLNG Corporation, Base Petroleum, Incorporated, and Columbia Energy Services Corporation;  John H. Tinney, Charleston, West Virginia, James W. Draughn, Jr., Michael S. Becker, KIRKLAND & ELLIS, L.L.P., Washington, D.C., for Appellees SEMCO Pipeline Company and SEMCO Energy Ventures, Incorporated; Jeffrey M. Wakefield, Erica M. Baumgras, FLAHERTY, SENSABAUGH & BONASSO, Charleston, West Virginia, Howard Feller, Bryan A. Fratkin, J. Brent Justus, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellees Dominion Cove Point LNG, LP, Dominion Cove Point LNG Company, LLC, Defendant Class A: Three Federally Regulated Interstate Natural Gas Pipeline Companies (Columbia Gas Transmission Company, Columbia Gulf Transmission Company, and The Cove Point LNG Limited Partnership) That Participated in An Illegal Scheme, etc., and Virginia Electric and Power Company; Mark E. Williams, HUDDLESTON BOLEN, Huntington, West Virginia, Steven Dahm, PILLSBURY, WINTHROP, SHAW & PITTMAN, L.L.P., San Francisco,

California, for Appellee Dynegy, Incorporated; David K. Hendrickson, HENDRICKSON & LONG, Charleston, West Virginia, Paul J.

Franzetti, MCDADE, FOGLER & MAINES, Houston, Texas, for Appellee El Paso Merchant Energy, LP.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this contract action, the district court granted Appellees' joint motion to dismiss Appellant AtlantiGas Corporation's claims arising out of an alleged illegal natural gas parking and lending scheme perpetrated by Appellees on the basis that AtlantiGas Corporation ("AtlantiGas") lacked standing due to its sale of those claims under an Asset Purchase Agreement. AtlantiGas appeals the district court's disposition. For the reasons that follow, we affirm.

I.

Gaslantic Corporation ("Gaslantic") was a purchaser of natural gas supplies in the wholesale market for resale to commercial and industrial end-user customers, who in turn burned the gas for heating or manufacturing purposes. Gaslantic also provided advisory services to the end-user natural gas customers in connection with those customers' acquisition of natural gas.

In September 1998, pursuant to an Asset Purchase Agreement (the "Agreement"), Pepco Services, Inc. ("PSI") agreed to purchase and Gaslantic agreed "to sell, transfer, convey, and deliver to [PSI] . . . all of the Acquired Assets for the consideration specified [in the Agreement]." The parties defined the term "Acquired Assets" in part as "all right, title, and interest in and to all of the assets and properties of [Gaslantic] owned, used or

4

held for use by [Gaslantic] primarily in connection with the Business, whether tangible or intangible, whether real, personal, or mixed, whether fixed, contingent or otherwise, and wherever located. . . ." The "Business" as defined in the Agreement is limited to the "business of retail natural gas marketing and advisory services." In addition to selling all of its Acquired Assets, Gaslantic agreed to change its name to AtlantiGas Corporation and contracted, as AtlantiGas, not to engage in any natural gas related business for a specified period of time.

In consideration for Gaslantic's sale of all of its Acquired Assets, PSI agreed to pay Gaslantic $4.23 million plus Contingent Payments, which were calculated according to PSI's annual gross earnings.

In February 1999, subsequent to consummation of the PSI and Gaslantic Agreement, two natural gas pipeline companies, Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company, disclosed their conduct in an alleged illegal parking and lending scheme to the Federal Energy Regulatory Commission ("FERC"). According to this disclosure, from 1996 to May 1999, three pipeline companies ("Pipeline Company Defendants") were allegedly providing eight select natural gas shipper companies ("Select Shipper Defendants") with illegal natural gas storage and transportation services in exchange for "kickback" payments. The scheme allegedly allowed the Select Shipper Defendants to deliver

5

natural gas at locations and prices that other natural gas shippers could not meet.

FERC instituted an investigation and in October 2000, issued an order approving a Stipulation and Consent Agreement with regard to the two pipeline companies who reported their actions. Under this order, Columbia Gas Transmission Corporation and Columbia Gulf Transmission Company agreed to refund certain penalties and disgorge profits to the industry participants who FERC found had been illegally excluded from the scheme.

Thereafter, on October 22, 2004, AtlantiGas joined seven other "non-select" natural gas shipper companies (collectively "Plaintiffs") in filing a proposed class action against the Pipeline Company Defendants and the Select Shipper Defendants (collectively "Appellees") in West Virginia state court, seeking damages under theories of breach of contract, unjust enrichment, and violations of state and federal antitrust laws. Appellees removed the case to federal court. Subsequently, Appellees filed a joint motion to dismiss AtlantiGas pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. In short, Appellees contended that pursuant to the terms of the Agreement AtlantiGas had sold the claims it asserted in the underlying lawsuit to PSI and, therefore, did not have standing to pursue those claims against Appellees.

6

The district court dismissed all of AtlantiGas's claims, concluding that AtlantiGas had sold all its claims under the terms of the Agreement. The district court found that the language of the Agreement was clear and unambiguous on its face and that since the claims arising out of the alleged illegal parking and lending scheme had been transferred to PSI as part of the sale of Gaslantic, AtlantiGas had not suffered a redressable injury and, therefore, did not have standing to pursue the instant claims against Appellees. On appeal AtlantiGas challenges the district court's conclusion.

This court reviews the district court's dismissal for lack of subject matter jurisdiction de novo. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768-69 (4th Cir. 1991) (citing Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989); Shultz v. Dept. of the Army, 886 F.2d 1157, 1159 (9th Cir. 1989)). In ruling on a Rule 12(b)(1) motion a court must apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. Richmond, 945 F.2d at 768 (citing Trentacosta v. Frontier Pacific Aircraft Indus., 813 F.2d 1553, 1558 (9th Cir. 1987)). "The moving party should prevail only if the material

7

jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (citing Trentacosta, 813 F.2d at 1558).

We apply the substantive law of the State of Delaware to AtlantiGas's claims, as the parties agreed that the Agreement is "governed by and construed in accordance with the domestic laws of Delaware." See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941) and Oglesby v. Penn Mutual Life Ins. Co., 877 F. Supp. 872, 878 (D. Del. 1994) (noting that "[u]nder Delaware law, where contracting parties have agreed on what law governs, a court may forgo independent analysis and accept the parties' agreement") (citing Wilmington Trust Co. v. Wilmington Trust Co., 24 A.2d 309, 313 (Del. Ch. 1942); Rosenmiller v. Bordes, 607 A.2d 465, 468 (Del. Ch. 1991); National Acceptance Co. of California v. Mark S. Hurm, M.D., P.A., CA 84L-JN-7, 1989 WL 70953 *1 (Del. Super. Ct. June 16, 1989)).

### B.

A court does not have subject matter jurisdiction over an individual who does not have standing. "Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States." Pye v. United States, 269 F.3d 459, 466 (4th Cir. 2001) (citing Steel Co. v.

8

Citizens for a Better Env't, 523 U.S. 83, 102 (1998)). The core goal of the standing requirement is to ensure that a plaintiff has enough of a stake in the case to litigate it properly. Id.

There are three basic components to standing: injury, causation and redressability. Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997). To satisfy the constitutional standing requirement, a plaintiff must provide sufficient evidence to support the conclusion that: (1) plaintiff suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision of the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted); White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005).

III.

A.

AtlantiGas initially contends that the district court erred in dismissing the claims it asserts against Appellees because these claims were unknown to AtlantiGas at the time it entered into the Agreement and the Agreement provided only for the transfer of

9

"known" claims. Alternatively, AtlantiGas maintains that, at a minimum, the Agreement is ambiguous on the issue of whether the claims were included or excluded as Acquired Assets under the Agreement and, therefore, the district court improperly granted Appellees' motion to dismiss.

"The basic rule of contract construction gives priority to the intention of the parties." E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985) (citing Radio Corp. of Am. v. Philadelphia Storage Battery Co., 6 A.2d 329 (Del. Supr. 1939); Pennwalt Corp. v. Plough, Inc., 676 F.2d 77, 80 (3rd Cir. 1982); DuPont v. Wilmington Trust Co., 45 A.2d 510 (Del. Ch. 1946); Restatement (Second) of Contracts § 202). A court must determine the intent of the parties from the language of the contract. Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624, 628 (Del. 2003) (citing Kaiser Alum. Corp. v. Matheson, 681 A.2d 392, 395 (Del. 1996)). This determination may require a court to decide whether or not the disputed contract language is ambiguous. Id. "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992). Rather, "[c]ontract language is ambiguous if it is 'reasonably susceptible of two or more interpretations or may have two or more different meanings.'" Twin City Fire, 840 A.2d at 628 (quoting Kaiser Alum. Corp., 681 A.2d at 395).

10

Ambiguity does not exist where the court can determine the meaning of the contract without any guide other than the knowledge of the simple facts on which its meaning depends. Rhone-Poulenc, 616 A.2d at 1196 (quoting Holland v. Hannan, 456 A.2d 807, 815 (D.C. App. 1983)). Where no ambiguity exists, the contract will be interpreted according to the "'ordinary and usual meaning' of its terms." Twin City Fire, 840 A.2d at 628 (quoting Rhone-Poulenc, 616 A.2d at 1195). A court will not torture contractual terms to create ambiguity where the ordinary meaning of the terms leaves no room for uncertainty. Id. (citing Zullo v. Smith, 427 A.2d 409, 412 (Conn. Supr. 1980)). Thus, the true test of whether a contract is ambiguous "is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Id. (citing Steigler v. Insurance Co. of N. Am., 384 A.2d 398, 401 (Del. Supr. 1978); State v. Attman/Glazer, 594 A.2d 138, 144 (Md. 1991)).

In upholding the intention of the parties, the court must construe the agreement as a whole, giving effect to all provisions contained therein. E.I. du Pont, 498 A.2d at 1113 (citing State v. Dabson, 217 A.2d 497 (Del. Supr. 1966); Bamdad Mech. Co. v. United Techs. Corp., 586 F. Supp. 551 (D. Del. 1984)). "Moreover, the meaning which arises from a portion of the agreement cannot control the meaning of the entire agreement where such interference runs contrary to the agreement's overall scheme or plan." Id. (citing

11

Stemerman v. Ackerman, 184 A.2d 28, 34 (Del. Ch. 1962); Bamdad Mech. Co., 586 F. Supp. at 555; Faw, Casson & Co. v. Cranston, 375 A.2d 463, 466 (Del. Ch. 1977)).  "All provisions of a policy are to be read together and construed according to the plain meaning of the words involved, as to avoid ambiguity while at the same time giving effect to all provisions."  Hercules Inc. v. Onebeacon Am. Ins. Co., 852 A.2d 33, 35 (Del. Super. Ct. 2004) (citing Delaware County Constr. Co. v. Safeguard Ins. Co., 228 A.2d 15 (Pa. Super. 1967)).

With these principles in mind, we turn to the district court's dismissal of AtlantiGas's claims.

B.

In pertinent part, the  Asset Purchase Agreement provides that Gaslantic sold "*all* of the Acquired Assets."  (emphasis added). These "Acquired Assets" are defined as:

> *all* right, title, and interest in and to *all* of the assets and properties of [*Gaslantic*] *owned, used or held for use by [Gaslantic] primarily in connection with the Business*, whether tangible or intangible, whether real, personal or mixed, whether fixed, contingent *or otherwise*, and wherever located, *including, without limitation*, the following: . . . (e) *all* of its . . . causes of action, chooses [sic] in action, rights of recovery. . . .

(emphasis added).  Moreover, "the Business" is defined in the Agreement as "the business of retail natural gas marketing and advisory services."

12

Our review of the Agreement leads us to conclude that AtlantiGas's contention that the parties only contracted to transfer "known" claims is not supported by the clear language of the Agreement and the use of the word "all." In fact, the Agreement does not differentiate between "known" and "unknown" claims. Rather, according to the unambiguous language of the Agreement, *all* assets that were "owned, used or held for use, by [Gaslantic] primarily in connection with the [business of retail natural gas marketing and advisory services]" were transferred from Gaslantic to PSI as an Acquired Asset. Notably, the Agreement further emphasized that such assets included those which are "tangible or intangible, . . . whether fixed, contingent, or otherwise" and specified that "all of [Gaslantic's] . . . claims . . ., causes of action, chooses [sic] in action, rights of recovery, rights of set off, and rights of recoupment . . ." were included in this definition. The use of the word "contingent" would include assets dependent upon unknown future events. A "contingency" is defined as "something liable to happen as an adjunct to or result of something else." Merriam-Webster Dictionary, http://www.m-w.com/cgi-bin/dictionary (last visited November 8, 2006).

Therefore, the question is whether the claims AtlantiGas asserts against Appellees fall within the definition of "Acquired Assets." Or, put another way, were these claims "owned, used or

held for use by Gaslantic primarily in connection with the Business." The Complaint answers this question in the affirmative. AtlantiGas asserted its right to join in the Complaint against Appellees on the basis that it "was (1) a purchaser, marketer, wholesaler, manager, seller and shipper of natural gas; (2) a customer of [Columbia Gas Transmission Corporation]; and (3) was damaged by the illegal scheme perpetrated by defendants and subject to this complaint." However, since AtlantiGas's claims arose out of its role in the natural gas market, those claims were clearly owned, used or held for use primarily in connection with the Business and, therefore, passed as an asset to PSI under the definition of "Acquired Asset." Additionally, the use of the word "all" solidifies our position that the claims asserted by AtlantiGas were transferred to PSI under the Agreement. By using the word "all," the sale of claims language is unqualified and absolute. As noted by the Delaware courts, "'[a]ll' means 'all,' or if that is not clear, all, when used before a plural noun such as 'assets,' means '[t]he entire or unabated amount or quantity of; the whole extent, substance, or compass of; the whole.'" Hollinger Inc. v. Hollinger Intern., Inc., 858 A.2d 342, 377 (Del. Ch. 2004).

Given the unambiguity of the language of the Agreement, we agree with the district court that AtlantiGas sold to PSI the claims it asserts against Appellees. Consequently, AtlantiGas does not have standing to assert those claims here and the district

14

court properly granted Appellees' joint motion to dismiss for lack of subject matter jurisdiction.

C.

AtlantiGas alternatively argues that it has standing with respect to the claims it asserts against Appellees because, irrespective of whether it sold such claims under the Agreement, through the Contingent Payment provision of the Agreement it retained an ownership interest in the profits earned by PSI, which interest was damaged due to the alleged illegal parking and lending scheme.

The Agreement provided for AtlantiGas to receive Contingent Payments from PSI as part of the purchase price.  Specifically, in this respect the Agreement provides as follows:

> (ii) Subject to the terms and conditions of this Agreement . . . [PSI] shall pay [Gaslantic] the following contingent payments as part of the purchase price (each individually, a "*Contingent Payment*;" collectively, the "*Contingent Payments*"):
>
> (A) On or before March 31, 2000, fifteen percent (15%) of the first Six Million Dollars ($6,000,000) in Adjusted Gross Receipts from the operations of the Gaslantic Division relating to commodity sales, utility advisory services and third-party contract services (collectively, the "Operations"), in calendar year ("CY") 1999, and twenty percent (20%) of all Adjusted Gross Receipts from the Operations above $6,000,000 in CY 1999.
>
> (B) On or before March 31, 2001, fifteen percent (15%) of the first Fourteen Million Dollars ($14,000,000) in Adjusted Gross Receipts from the Operations in calendar year 2000, and twenty percent (20%) of all Adjusted Gross Receipts from the Operations above $14,000,0000 in CY 2000.

15

(C) On or before March 31, 2002, fifteen percent (15%) of the first Eighteen Million Five Hundred Thousand Dollars ($18,500,000) in Adjusted Gross Receipts from the Operations in calendar year 2001, and twenty percent (20%) of all Adjusted Gross Receipts from the Operations above $18,500,000 in CY 2001.

(D) On or before March 31, 2003, ten percent (10%) of all Adjusted Gross Receipts from the Operations in CY 2002.

(E) On or before March 31, 2004, ten percent (10%) of all Adjusted Gross Receipts from the Operations in CY 2003.

Despite AtlantiGas's arguments to the contrary, this Contingent Payment provision does not give AtlantiGas standing to assert its claims against Appellees. First, the clear language of the Agreement establishes that these Contingent Payments represented a contractual right, and part of the consideration that PSI paid to purchase Gaslantic. Or, put another way, Gaslantic sold *all* of its Acquired Assets for $4.23 million and the Contingent Payments. Therefore, if PSI did not pay AtlantiGas according to the Contingent Payment schedule outlined in the Agreement, and do so honestly as an accounting matter, AtlantiGas's recourse would be to pursue its recovery from PSI, and not from the Appellees named here.[*] In fact, if AtlantiGas were permitted to

---

[*]Indeed, AtlantiGas did sue PSI and settled all claims asserted in that lawsuit. AtlantiGas Corp. v. Potomac Electric Power Co. et al._, No. 1:02-CV-00829 (PLF) (D.D.C. filed June 17, 2002). In its complaint against PSI, AtlantiGas alleged that PSI withheld various post-closing payments due to PSI's alleged alteration of the company's books and an alleged failure by PSI to capture and appropriately account for PSI's post-closing sales.

pursue its claims against Appellees, it would be receiving a double recovery – first from PSI due to its failure to meet the correctly adjusted Contingent Payment schedule and second from the Appellees, whose illegal parking and lending scheme allegedly resulted in a diminution of the Contingent Payments.

Moreover, as noted above, the Constitutional prerequisites to establish standing require a plaintiff first to show that it suffered an injury in fact, which means that it must establish an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical. White Tail Park, 413 F.3d at 458. Here, there is no evidence that AtlantiGas suffered a concrete and particularized harm as a result of Appellees' alleged actions. If we were to agree with AtlantiGas's contentions, then we would be forced to guess what diminution in revenues, if any, is attributable to PSI and what diminution, if any, is attributable to Appellees. Such alleged damage is too conjectural and abstract, not distinct and palpable. See Allen v. Wright, 468 U.S. 737, 751 (1984) (stating that a core component for standing is that the plaintiff allege personal injury fairly traceable to the defendant's alleged unlawful conduct and likely to be redressed by the requested

---

AtlantiGas alleged that as a result of this conduct, PSI diverted monies owed to AtlantiGas and understated the final value of the Gaslantic business.

17

relief).   Therefore, the district court properly dismissed AtlantiGas's claims against Appellees.

## IV.

Based on the foregoing, it is hereby ordered that the order of the district court is

<u>AFFIRMED</u>.